**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

JAMES SAK and PEGGY LEIFER,

      Plaintiffs,

vs.

THE CITY OF AURELIA, IOWA,

      Defendant.

No. C 11-4111-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

---

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   A. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      1. The parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      2. The parties' dispute . . . . . . . . . . . . . . . . . . . . . . . . 5
         a. The plaintiffs' pit bull dog . . . . . . . . . . . . . . . . 5
         b. The City's "no pit bull dogs" ordinance . . . . . . . . . . 7
         c. Action by the City . . . . . . . . . . . . . . . . . . . . . 9
   B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      1. The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      2. The Motion For Preliminary Injunction . . . . . . . . . . . . . 14
      3. The hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   A. Standards For A Preliminary Injunction . . . . . . . . . . . . . . . . . 15
   B. Likelihood Of Success On The Merits . . . . . . . . . . . . . . . . . . . 17
      1. The scope of Title II of the ADA . . . . . . . . . . . . . . . . 18
      2. "Service animal" regulations under Title II . . . . . . . . . . 21
      3. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   C. Irreparable Harm To Sak . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   D. Balance Of Equities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

     *E.  The Public Interest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     *F.  Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

***III.  THE BOND REQUIREMENT*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

***IV.  CONCLUSION*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

The one absolutely unselfish friend that man can have in this
selfish world, the one that never deserts him, the one that
never proves ungrateful or treacherous, is his dog. . . .  He
will kiss the hand that has no food to offer; he will lick the
wounds and sores that come in encounter with the roughness
of the world. . . .  When all other friends desert, he remains.
> — George G. Vest, "Vest's Eulogy to the Dog"
> (from his closing argument to a jury in an 1872
> case involving the illegal shooting of a hunting
> dog), 1943-44 *Official Manual State of Missouri*
> 1129.[1]

When a man's best friend is his dog, that dog has a problem.
> — Edward Abbey (American environmentalist,
> 1927-1989)

D oes the Americans with Disabilities Act entitle a seriously disabled plaintiff,
James Sak, and his part pit bull certified service dog, Snickers,[2] banned
from the City of Aurelia by a municipal ordinance prohibiting pit bull dogs in the city, to

---

[1] Quoted in *Miller v. Clark County*, 340 F.3d 959, 967 n.13 (9th Cir. 2003); *Murray v. Leyshock*, 915 F.2d 1196, 1202 n.1 (8th Cir. 1990) (Bright, Sr. C.J., dissenting); *see also Bowlin v. Deschutes County*, 712 F. Supp. 803, 809 (D. Or. 1988) (attributing the quotation to a speech George Vest later made as a U.S. Senator in 1884).

[2] Snickers was presumably named after the famous candy bar, which was, in turn, named after a favorite race horse owned by candy maker Franklin Clarence Mars and his wife.  The horse had died just a month before the candy bar was created.  Mars, who was a victim of polio as a child, could not run around like most children, so he developed his interest in candy, instead.  *See* http://www.helium.com/items/1387617-snickers-candy-bar-frank-mars-mars-candy.

a preliminary injunction barring enforcement of the ordinance as to Snickers and reuniting Sak and his best friend?  The plaintiffs argue that the city's ordinance and refusal to grant an exception for Sak's registered service animal violate the "public entities" provisions of the Americans with Disabilities Act (ADA), Title II, 42 U.S.C. § 12131 *et seq.*, and applicable regulations and rules.  The city argues that the ordinance does not prevent the plaintiffs from having a service animal of a different breed, so that it does not discriminate against an individual with a disability, and that the plaintiffs have failed to show that the city discriminated on the basis of disability as to any program, service, or activity of the city.  After expedited proceedings, I issue this ruling on the plaintiffs' December 22, 2011, Motion For Preliminary Injunction (docket no. 2).

## I.  INTRODUCTION

### A.  Factual Background

I am mindful of the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *accord United States Sec. and Exchange Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.'") (quoting *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985)); *National Credit Union Admin. Bd. v. Johnson*, 133 F.3d 1097, 1103 n. 5 (8th Cir. 1998) (quoting this principle from *Camenisch* ); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and conclusions of law in preliminary injunction rulings).  Thus, all findings of fact and conclusions of law in this ruling are provisional.  For purposes of the preliminary injunction motion only, the parties have agreed upon

certain facts.  *See* Joint Hearing Exhibit K (Stipulated Facts).  Furthermore, the City does not dispute the facts as averred by the plaintiffs in the "Facts" section of their brief.

### 1.    The parties

Plaintiff James Sak is a retired police officer, who recently moved with his wife, plaintiff Peggy Leifer, to Aurelia, Iowa, from Chicago, Illinois.  Sak and Leifer, who married in 2009, moved to Aurelia in November 2011 to care for Leifer's elderly mother, who is an Aurelia resident.  In November 2008, prior to the couple's marriage and their move to Aurelia, Sak suffered a hemorrhagic stroke, which has left him permanently disabled, with no control over the right side of his body, and confined to a wheelchair. Defendant City of Aurelia is, according to its website, www.aureliaia.com, a municipality with a population of "nearly 1,100 people" in Cherokee County in northwest Iowa.

### 2.    The parties' dispute

#### a.    The plaintiffs' pit bull dog

Sak has had a dog, named Snickers, who is believed to be a pit bull mix, since the dog was ten weeks old.  Complaint, ¶¶ 16, 24; Stipulated Facts, ¶ 10.  According to Sak, Snickers, who is now five-and-a-half years old, has absolutely no history of aggression. Complaint at ¶ 17-18.  Sak adopted Snickers in a private, informal sale, *see* Complaint at ¶ 15; Stipulated Facts at ¶ 9, from a "backyard breeder," Plaintiffs' Brief In Support Of Plaintiffs' Motion For Preliminary Injunction (Plaintiffs' Brief) (docket no. 2-1), 2.

Although Snickers was originally a family pet, *see* Plaintiffs' Brief at 2, after Sak's stroke, Snickers was trained and certified by Sak's physical therapist as a "service animal" to assist Sak with everyday tasks.  Quite recently, on November 28, 2011, Snickers became a "Certified Service Animal" on the National Service Animal Registry (NSAR). *See id.*, Exhibit A (NSAR Certificate); Hearing Exhibit A (same).  More specifically, Snickers's NSAR certificate states, in pertinent part, the following:

> This document affirms that "**SNICKERS**" (NSAR database ID **C12694**, see adjacent photo) is certified as a qualified service dog and registered with National Service Animal Registry (NSAR) on the date listed below [November 28, 2011]. This service dog has been trained to assist **P LEIFER** [sic], the confirmed disabled handler. The handler and service dog are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html**.
>
> Service dogs are dogs that are specifically trained to perform important life tasks for people who have difficulty performing or are unable to perform the task themselves. These tasks are directly related to the handler's disability. Service dogs are working animals, not pets.

NSAR Certificate; Stipulated Facts at ¶ 13. Sak and Leifer testified that, although they did not believe that any such certificate was required, they obtained this NASR Certificate for Snickers after the City expressed concerns about him, hoping to make the City's decisionmakers more "comfortable" or "feel better" about Snickers's presence in the City.

As explained in a letter from Sak's physical therapist, Aileen Eviota, at the University of Illinois Medical Center, dated December 2, 2011, to the Aurelia City Council, Sak requires Snickers's assistance with routine tasks made difficult by his limitations after his stroke:

> Due to his stroke, James Sak has certain limitations regarding his entire right side of his body. In order to help alleviate these difficulties, and to enhance his quality of life, well being, and ongoing recovery, he requires a service dog, Snickers. As mentioned before, I have been involved in his care for more than 2 years. Our therapy sessions have also included rehabilitation with James Sak and Snickers, in which I was personally involved in [sic]. James and Snickers have worked together under my supervision in which his ability to live

6

independently has improved.  Snickers has been individually
trained to assist James with tasks which mitigate his disability,
including walking, balance, and retrieving items around the
house.

Complaint (docket no. 1), Exhibit B (Physical Therapist's Letter); Hearing Exhibit B
(same); Stipulated Facts at ¶¶ 14-15.

I find that Snickers was individually trained by Sak's physical therapist to assist Sak
with his specific needs and limitations.   More specifically, Sak testified, without
contradiction, that Snickers helps him when he walks short distances within his home;
recognizes when he suffers tremors on the right side of his body and either lays on the
affected part of the body to stop the tremor or gets Leifer to assist Sak; pushes Sak against
the wall to prevent him from falling if he has tremors or balance problems while walking
in the home; gets Leifer to assist Sak in other circumstances; helps Sak when he falls by
letting Sak hold on to his collar to roll over or get back up or into his wheelchair; and
accompanies Sak when he sits outside in his backyard.   Sak testified that he is "lost"
without Snickers, and Leifer testified that she does not feel able to leave Sak if Snickers
is not with him.   Leifer testified that the plaintiffs do not intend to use Snickers to assist
Sak with trips away from the home.

### b.     The City's "no pit bull dogs" ordinance

The City of Aurelia, however, has an ordinance, Chapter 58, which provides, in
pertinent part, as follows:

> **58.02  KEEPING OF PIT BULL DOGS PROHIBITED**.  It
> is unlawful to keep, or harbor, own or in any way possess a
> Pit Bull Dog within the City of Aurelia.

Complaint, Exhibit D (Ordinance).  This portion of the Ordinance does not include any
fines, penalties, or other remedies for a violation.

"Pit Bull Dog" is defined in the ordinance as follows:

> **58.01 DEFINITIONS**.  For use in this chapter the following terms are defined as follows:
>> 1.      "Pit Bull Dog" shall mean any dog over the age of six (6) months known by the owner to be a Pit Bull Terrier.  Pit Bull Terrier shall mean any Bull Terrier, American Pit Bull Terrier, Staffordshire Bull Terrier, or American Staffordshire Bull Terrier breed of dog or any mixed breed of dog which contains as an element of its breeding the breed of Bull Terrier, American Pit Bull Terrier[,] Staffordshire Bull Terrier, or American Staffordshire Bull Terrier so as to be identifiable as partially of the breed Bull Terrier, American Pit Bull Terrier, Staffordshire Bull Terrier, or American Staffordshire Bull Terrier.

Ordinance § 58.01.  Leifer testified that the plaintiffs believe that Snickers is a pit bull mix based on the opinion of the backyard breeder from whom they obtained Snickers and the opinion of a veterinarian at the University of Illinois at Chicago Veterinary Medicine School.  There does not appear to be any dispute that Snickers is a "Pit Bull Dog" within the meaning of this provision, because he is believed to be a pit bull mix.

The Ordinance includes a "grandfather clause," making the Ordinance inapplicable to "owners, keepers, or harborers of Pit Bull Dogs licensed with the City of Aurelia before the effective date of this chapter," with other requirements for "[t]he keeping of licensed dogs."  *Id.* at § 58.03(1) (**"KEEPING OF LICENSED PIT BULL DOGS**" section, subsection pertaining to "licensed" pit bulls).  Those other requirements include a prohibition on the sale or transfer of a pit bull dog; removal of offspring born to licensed pit bull dogs from the City within six weeks of birth; reporting of the removal or death of a licensed pit bull dog, the birth of offspring of a licensed pit bull dog, or a change of address of the owner within the city limits; leashing and muzzling requirements;

8

confinement requirements; and requirements for identification photographs and tattoos.
Ordinance, §58.03(1)(A)-(G).  The Ordinance also provides as follows:

> 2.     Failure To Comply.  It shall be unlawful for the
> owner, keeper, or harborer of a Pit Bull Dog licensed
> with the City of Aurelia to fail to comply with the
> requirements and conditions set forth in this chapter.
> Each day of violation shall be a separate offense.  *Any
> Pit Bull Dog found to be the subject of a violation of
> this chapter shall be subject to immediate confiscation
> by the Animal Control Officer.  Such animal shall be
> humanely destroyed within seven (7) days, unless a
> Judge of a Court of competent jurisdiction orders its
> release or the owner provides adequate proof to the
> Animal Control Officer that such licensed dog shall no
> longer reside in the City of Aurelia.*

Ordinance, § 58.03(2) (emphasis added).  Although the italicized language appears to
apply to "any Pit Bull Dog found to be the subject of a violation of this chapter," it is
found in a section of the Ordinance otherwise devoted entirely to "licensed" Pit Bull Dogs.

### c.     *Action by the City*

Sak and Leifer were asked to attend an Aurelia City Council meeting on November
21, 2011, because of the City's Ordinance prohibiting the possession of a pit bull dog.
According to the plaintiffs, they brought Snickers along to that meeting, and Snickers sat
quietly at their feet throughout, only crying or whining quietly when his name was
mentioned.  Sak and Leifer contend that, in the course of the November 21, 2011,
meeting, a petition was presented, signed by 36 residents, asking for enforcement of the
Ordinance against Snickers.   The petition in question does not refer specifically to
Snickers, however.  Instead, it states the following:

> We the undersigned citizens of the City of Aurelia do
> respectfully request/urge the Aurelia City Council retain as

9

> written an[d] without exception the existing City of Aurelia
> Ordinance, Chapter 58 - "Pit Bull Dogs."  It is our concern
> that a change or any exceptions to the Ordinance could cause
> an unwanted safety/hazard to the general public,
> specifically/especially our children.

Complaint, Exhibit E (Petition); Hearing Exhibit E.

The pertinent portion of the minutes of the November 21, 2011, meeting of the
Aurelia City Council reflect that the Council did not take any action toward Sak, Leifer,
or Snickers at that time.  Instead, what the minutes do reflect is the following:

> James Sak and Peggy Leifer appeared before Council
> concerning registering their mix breed pitbull.  The City of
> Aurelia Ordinance Chapter 58 "Pit Bull Dog" states it is
> unlawful to harbor a pit bull or any mixed breed of pit bull.
> Nelson [a council member] made motion to table until next
> month's meeting in order to receive more input from longer
> term council members, second[ed] by Schulenberg [another
> council member].  All members present voting "aye", motion
> carried.

Complaint, Exhibit C (November 21, 2011, Minutes), at 2-3.  Leifer testified that it was
her understanding that nothing would be done by the City until the next meeting.

Nevertheless, on November 28, 2011, the plaintiffs obtained the NASR Certificate
for Snickers.  Also, on December 2, 2011, Sak's physical therapist, Aileen Eviota,
provided the letter to the Aurelia City Council, quoted in part above, explaining Sak's need
for Snickers's assistance.  *See* Physical Therapist's Letter.  Also, on December 6, 2011,
the plaintiffs and an attorney that they had hired met with representatives of the City to
discuss rewriting the Ordinance to include an amendment to add a new section, proposed
by the plaintiffs, to provide an exception for service dogs and disabled persons.  On
December 7, 2011, the plaintiffs' attorney provided the City with a copy of a proposed
amendment.  *See* Hearing Exhibit I.

10

Sak and Leifer received a telephone call from the City Clerk notifying them of a special meeting of the City Council on December 14, 2011, a little over 24 hours before that meeting.  According to Leifer, the Clerk told her she was not at liberty to discuss the purpose of the meeting when Leifer asked.  Nevertheless, Leifer admits that she understood that the meeting related to Snickers and the Ordinance.  At that meeting, the plaintiffs were told that they had 24 hours to remove Snickers from the City.  Complaint, ¶ 26; Stipulated Facts at ¶ 20.  The minutes of the December 14, 2011, *see* Hearing Exhibit F, reflect that the City Council discussed the plaintiffs' proposed amendment to the Ordinance, entitled "Service Dog & Disabled Person Exception"; reviewed a letter from a law firm indicating concerns of Aurelia citizens who requested that Snickers be removed by enforcing the existing Ordinance; and reviewed the Petition.  The minutes conclude as follows:

> After hearing from everyone in attendance, Mayor Keith respectfully requested the Council discuss and consider all input received.  Following further discussion, Bowen made motion to uphold the current City of Aurelia Ordinance #58 "Pit Bull Dog" as it stands, second by Nelson.  Roll Call Vote "aye" Nelson, Schulenberg, Bowen "nay" Fredricksen, Lindgren.  Motion carried 3-2.

> Mayor Keith respectfully informed James Sak and Peggy Leifer to have the dog kenneled out of the Aurelia City limits pending legal advice from the City's Attorney.

> There being no further business to discuss, meeting adjourned.

Hearing Exhibit F.  It does not appear that there was any discussion of whether amendment of the Ordinance was required by Title II of the ADA or any other state or federal law.

Sak and Leifer complied with the Council's directive, and, since the December 14, 2011, meeting, Snickers has been boarded at a veterinary's office outside the City of

Aurelia, at their expense.  Although Sak and Leifer asserted in briefing that, because of the Christmas holiday, the veterinarian kenneling Snickers informed them that he had no capacity for Snickers after December 23, 2011, no evidence was offered as to whether or not they were required to or did find other accommodations for Snickers after that date.

Sak suffered a fall from his wheelchair on December 15, 2011, and was unable to pull himself back into his chair without the assistance of Snickers.  Consequently, he called 911 for assistance, and a law enforcement officer arrived at his residence to assist him. Sak testified that he fell again about two days later, but that he was eventually able to get onto a couch without calling 911.  Sak and Leifer also allege that Leifer's ability to care for her elderly mother has been compromised by her inability to leave Sak alone, for fear of another fall or injury, because Snickers is not available.  Sak asserts that he has been deprived of both the medical and emotional benefit provided by Snickers since December 15, 2011.

The plaintiffs offered and I received into evidence a letter dated December 23, 2011, from one signatory of the Petition to the plaintiffs' counsel retracting her signature to the Petition.  *See* Hearing Exhibit L.  The plaintiffs also testified that they received telephone calls from other signatories after the City Council's action on December 14, 2011, indicating that the callers no longer supported the Petition.

### B.  Procedural Background

### 1.    The Complaint

On December 22, 2011, Sak and Leifer filed their Complaint (docket no. 1) initiating the present lawsuit, naming the City of Aurelia as the only defendant.  They assert that the actions of the City, a "public entity," violate Title II of the Americans with Disabilities Act, even though the City knew that Sak required Snickers's assistance because

of his disability, and that the City's discrimination against Sak on the basis of his disability has damaged Sak.[3]  They seek declaratory judgment that the City's policies, regulations, practices, and conduct of interfering with Sak's ability to utilize his service dog and its refusal to remove the breed restrictions for his service dog from its Ordinance are contrary to and in violation of the ADA.  They also seek injunctive relief "restraining the City of Aurelia from enforcing the city ordinance prohibiting pit bulls, with respect to Mr. Sak's service dog and an immediate return of the service dog, Snickers[,] to Mr. Sak"; "order[ing] [the City] to permit service dog Snickers to be immediately returned to Plaintiffs"; and "order[ing] that [the City] is precluded from enforcing its city ordinance restrictions against Snickers that apply to pit bulls in Aurelia, Iowa[,] that are 'grandfathered in.'"  Complaint, ¶¶ 50, 52-53.  The plaintiffs also seek damages for Leifer's loss of spousal consortium, on the ground that Leifer has lost the value of services of Sak, and has been unable to attend to her mother or depend upon her husband as a result of the loss of Snickers, and Sak is now substantially more dependent, requiring increased care that affects Leifer's ability to tend to other matters.  They also seek an award of emotional distress damages for the discrimination pursuant to the ADA, attorney's fees and costs, and such other relief as the court deems just and appropriate under the circumstances.  They seek a jury trial on their claims.

---

[3]The Complaint alleges "violation of 42 U.S.C. § 12133," but that section of the statute simply provides the same remedies, procedures, and rights set forth in 29 U.S.C. § 794a to any person alleging discrimination by a public entity on the basis of disability in violation of 28 U.S.C. § 12132.  *See* 42 U.S.C. § 12133.  Thus, the substantive provision on which the plaintiffs' claim is based is 42 U.S.C. § 12132.

### 2.      *The Motion For Preliminary Injunction*

Also on December 22, 2011, Sak and Leifer filed the Motion For Preliminary Injunction (docket no. 2), which is now before me.  In that motion, they seek an order from the court to the following effect:  (1) ordering an immediate return of Snickers to Sak; (2) enjoining the City from enforcing its Ordinance prohibiting pit bulls with respect to Snickers; (3) ordering that the City is precluded from enforcing its Ordinance restrictions against Snickers that apply to pit bulls in Aurelia, Iowa, that are "grandfathered in," because Snickers, as a service dog, cannot be held to the unreasonable restrictions that appear in the Ordinance if he is to do his job of protecting and assisting Sak; and (4) scheduling an evidentiary hearing on the motion within five days.

The City filed a Brief In Resistance To Plaintiffs' Motion For Preliminary Injunctive Relief (docket no. 10) on December 27, 2011.  In its Resistance, the City challenges Peggy Leifer's standing to assert an ADA claim, where she is not disabled; the viability of a cause of action for loss of spousal consortium under the ADA; and the viability of James Sak's ADA claim, where he has not identified any particular public service, program, or activity of the City that he has been unable to use as a result of the City's Ordinance, and the Ordinance does not bar him from having a non-pit bull service animal, which would reasonably accommodate his disability, if he had been barred from any service, program, or activity.

### 3.      *The hearing*

Owing to the intervening Christmas holiday and the need for the City to obtain counsel to respond to the Motion For Preliminary Injunction, I set an evidentiary hearing on the Motion for the sixth day after it was filed, December 28, 2011.  At that hearing, the plaintiffs were represented by Sharon Malheiro and Michele Warnock of Davis, Brown, Koehn, Shors & Roberts, P.C., in Des Moines, Iowa.  The City of Aurelia was

represented by Douglas Phillips of the Klass Law Firm in Sioux City, Iowa. At the hearing, Sak and Leifer both testified, and the City did not present any witnesses. The plaintiffs also offered, and I received, several exhibits, and the City did not offer any additional exhibits.

At the conclusion of the hearing, I announced that a preliminary injunction would issue upon the payment of $1 in security, with an order explaining my rationale for such a preliminary injunction to follow. I filed the Preliminary Injunction (docket no. 11), the text of which also appears at the end of this decision, shortly after the hearing. This order explains my rationale for that preliminary injunction.

## II. LEGAL ANALYSIS

### A. Standards For A Preliminary Injunction

The Supreme Court recently reiterated that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008)). As the Court explained,

> In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.[v. Gambell]*, 480 U.S. [531,] 542, 107 S. Ct. 1396 [(1987)]. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *[Weinberger v.] Romero–Barcelo*, 456 U.S. [305,] at 312, 102 S. Ct. 1798 [(1982)]; *see also Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500, 61 S. Ct. 643, 85 L.Ed. 971 (1941).

*Winter*, 555 U.S. at 24.

As the Eighth Circuit Court of Appeals has since explained,

> When evaluating whether to issue a preliminary injunction, a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant. *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). We review the denial of a preliminary injunction for abuse of discretion. *Id.* An abuse of discretion may occur when the district court rests its decision on clearly erroneous factual findings or erroneous legal conclusions. *TCF Nat'l Bank v. Bernanke*, 643 F.3d 1158, 1162–63 (8th Cir. 2011).

*Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705-06 (8th Cir. 2011). The "*Dataphase* factors," quoted just above and generally relied upon in the Eighth Circuit, are consistent with the factors relevant to success on a motion for preliminary injunction articulated by the Supreme Court in *Winter*. *See Sierra Club v. United States Army Corps of Engineers*, 645 F.3d 978, 989 (8th Cir. 2011). More specifically, as the Supreme Court explained in *Winter*, "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The relevant factors must be balanced: Specifically, the Court clarified in *Winter* that, where the defendant's interests and the public interest outweighed the movant's interests, as demonstrated by the movant's showing of irreparable harm, it was unnecessary to

consider whether the plaintiff had established a sufficient likelihood of success on the merits. *See id.* at 23-24; *Sierra Club*, 645 F.3d at 992-93.

The Eighth Circuit Court of Appeals has recognized that "'[t]he primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full effective relief.'" *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993) (quoting *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789-90 (8th Cir. 1989, in turn quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)). Thus, the court observed that "[r]equiring [the defendant] to take affirmative action . . . before the issue has been decided on the merits goes beyond the purpose of a *preliminary* injunction." *Id.* (emphasis in the original). The court explained that, where a movant seeks on its motion for preliminary injunction substantially the same relief it would obtain after a trial on the merits, the movant's burden is particularly "heavy." *Id.* (citing *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991)).

I will consider each of the pertinent *Dataphase/Winter* factors in turn, beginning with "likelihood of success on the merits."

## B. Likelihood Of Success On The Merits

"Success on the merits has been referred to as the most important of the four factors." *Roudachevski*, 648 F.3d at 706. In *Winter*, the Court noted that, as to the "likelihood of success" factor, "the standard for preliminary injunctive relief requires a showing of a 'likelihood of success on the merits rather than actual success' as necessary for permanent relief." *Sierra Club*, 645 F.3d at 993 (quoting *Winter*, 555 U.S. at 32, in turn quoting *Amoco Prod. Co.*, 480 U.S. at 546 n.12). The Eighth Circuit Court of Appeals has noted that this "preferred wording" of the standard for success differs

somewhat from the "once familiar" formulation in *Dataphase* requiring the plaintiff to show that, "at the very least," the plaintiff had "established a fair ground for litigation." *Id.* at 993. The question is not, however, whether the district court uses the preferred wording, but whether, in light of the evidence, the district court correctly concludes that the plaintiff is likely to succeed on at least some of its claims. *Id.* at 993-94.

I think it likely, at least at this preliminary stage of the proceedings, that the City is correct that Peggy Leifer does not have standing to pursue an ADA claim, where she is not herself disabled. *See* 42 U.S.C. § 12132 (prohibiting discrimination by a public entity against a "qualified individual with a disability"). I also find that there is likely no claim for loss of spousal consortium under the ADA. *See, e.g., Franz v. Kernan*, 951 F. Supp. 159, 162 (E.D. Mo. 1996); *Dunham v. City of O'Fallon, Mo.*, 945 F. Supp. 1256, 1263 (E.D. Mo. 1996), *aff'd*, 124 F3d 207 (8th Cir. 1997) (table op.). Thus, I will focus on Sak's likelihood of success on the merits of his claim. Sak's likelihood of success on the merits, here, turns on the extent to which Title II of the ADA and/or applicable regulations and rules require a municipality to make exceptions for a particular "service animal" of a particular breed to a prohibition on the presence of that particular breed of dog within the city limits in a city ordinance. I find that Sak has sufficient likelihood of success to weigh in favor of the preliminary injunctive relief that he seeks. *See id.*

### 1.    The scope of Title II of the ADA

"Title II [of the ADA] provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010)

18

(quoting 42 U.S.C. § 12132).[4]  A "public entity" means, *inter alia*, "any State or local government." 42 U.S.C. § 12131(1)(A).  A "qualified individual with a disability" within the meaning of Title II of the ADA is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). There does not appear to be any dispute that the City of Aurelia is a "public entity" or that Sak is a "qualified individual with a disability" within the meaning of Title II of the ADA.

Section 12134 of the ADA also authorizes the Attorney General to promulgate regulations to implement Title II.  42 U.S.C. § 12134(a).  In an *en banc* decision, the Seventh Circuit Court of Appeals explained,

> The Supreme Court never has decided whether these regulations are entitled to the degree of deference described in

---

[4]The main difference between Titles II and III of the ADA is that Title II applies to public entities, whereas Title III applies to private entities. *Caona v. Town & Country Credit*, 324 F.3d 1050, 1056 (8th Cir. 2003) ("Title III of the ADA prohibits discrimination on the basis of disability *in public accommodations*, while section 504 of the Rehabilitation Act (and Title II of the ADA) prohibit discrimination on the basis of disability *by public entities*." (emphasis added)); *see also Buchanan v. Maine*, 469 F.3d 158, 170 (1st Cir. 2006) (discussing titles of the ADA).  Individual members of the Aurelia City Council, in their personal capacities, "are not subject to suit under Title II, which provides redress only from public entities," *Baribeau*, 596 F.3d at 484, and they have not been named as defendants here.  The plaintiffs presumably could have brought suit against the individual City Council members, in their official capacities, and that suit would have been treated as a suit against the City. *See Baribeau*, 596 F.3d at 484.  Again, the plaintiffs did not sue the individual City Council members or any other City officials in their official capacities.

> *Chevron, U.S.A. Inc. v. National Resource Defense Council,*
> *Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694
> (1984). Nevertheless, the Court has said that, "[b]ecause the
> Department of Justice is the agency directed by Congress to
> issue regulations implementing Title II . . . its views warrant
> respect." *Olmstead v. L.C.*, 527 U.S. 581, 597-98, 119 S.Ct.
> 2176, 144 L.Ed.2d 540 (1999) (internal citations omitted).

*Wisconsin Community Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 n.10 (7th Cir.

2006) (*en banc*). Other courts have also held that, because Congress directed the Attorney

General (or Department of Justice (DOJ)) to "elucidate Title II [of the ADA] with

implementing regulations, DOJ's views at least would 'warrant respect' and might be

entitled to even more deference." *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir.

2011); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th Cir. 2010) ("'Department

of Justice regulations interpreting Title II should be given controlling weight unless they

are "arbitrary, capricious, or manifestly contrary to the statute."'" (quoting *McGary v.*

*City of Portland*, 386 F.3d 1259, 1269 n. 6 (9th Cir. 2004), in turn quoting *Chevron*

*U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984))).

The Attorney General's authority to promulgate regulations to implement Title II

of the ADA is important here, because, as the Seventh Circuit Court of Appeals has also

explained, "Title II of the ADA does not contain a specific accommodation requirement.

Instead, the Attorney General, at the instruction of Congress, has issued an implementing

regulation [28 C.F.R. § 35.130(b)(7)] that outlines the duty of a public entity to

accommodate reasonably the needs of the disabled." *Wisconsin Community Servs., Inc.*,

465 F.3d at 750-51; *accord Frame v. City of Arlington*, 657 F.3d 215, 231 (5th Cir. 2011)

(noting that Title II does more than prohibit disability discrimination by a public entity,

because it "imposes an 'obligation to accommodate,' or a 'reasonable modification

requirement,'" but expressing no opinion "as to whether (or when) a failure to make

reasonable accommodations should be considered a form of intentional discrimination, a form of disparate impact discrimination, or something else entirely"); *Pena v. Bexar County, Texas*, 726 F. Supp. 2d 675, 683 (W.D. Tex. 2010) (Title II of the ADA "imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals" (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005)).

The regulation requiring public entities to provide accommodations to persons with disability states the following:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). Pursuant to this regulation, "failure to accommodate is an *independent* basis for liability under the ADA." *Wisconsin Community Servs., Inc.*, 465 F.3d at 751 (emphasis in the original). This regulation "makes clear that an accommodation only is required when *necessary* to avoid discrimination *on the basis of* disability," and "that any accommodation must be a *reasonable* one." *Id.* (emphasis in the original).

### 2. "Service animal" regulations under Title II

The Attorney General recently promulgated a regulation specifically requiring public entitles to accommodate disabled individuals' use of "service animals," 28 C.F.R. § 35.136. That regulation, in pertinent part, provides as follows:

### § 35.136 Service animals.

(a) General.  *Generally, a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability.*

(b) Exceptions. A public entity may ask an individual with a disability to remove a service animal from the premises if—

> (1) The animal is out of control and the animal's handler does not take effective action to control it; or

> (2) The animal is not housebroken.

(c) If an animal is properly excluded.  If a public entity properly excludes a service animal under § 35.136(b), it shall give the individual with a disability the opportunity to participate in the service, program, or activity without having the service animal on the premises.

(d) Animal under handler's control.  A service animal shall be under the control of its handler.  A service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (e.g., voice control, signals, or other effective means).

(e) Care or supervision.  A public entity is not responsible for the care or supervision of a service animal.

(f) Inquiries.  A public entity shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal.  A public entity may ask if the animal is required because of a

disability and what work or task the animal has been trained to perform. A public entity shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. Generally, a public entity may not make these inquiries about a service animal when it is readily apparent that an animal is trained to do work or perform tasks for an individual with a disability (e.g., the dog is observed guiding an individual who is blind or has low vision, pulling a person's wheelchair, or providing assistance with stability or balance to an individual with an observable mobility disability).

(g) Access to areas of a public entity. Individuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go.

(h) Surcharges. A public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets. If a public entity normally charges individuals for the damage they cause, an individual with a disability may be charged for damage caused by his or her service animal.

28 C.F.R. § 35.136 (published September 15, 2010, and effective March 15, 2011) (emphasis added); *and compare Pena*, 726 F. Supp. 2d at 685 (noting that, at the time of its decision, June 21, 2010, the Department of Justice had not issued any regulations regarding "service animals" pursuant to Title II of the ADA).

In pertinent regulations, the Attorney General defined "service animal" for purposes of the ADA as follows:

Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a

23

disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition. The work or tasks performed by a service animal must be directly related to the individual's disability. Examples of work or tasks include, but are not limited to, assisting individuals who are blind or have low vision with navigation and other tasks, alerting individuals who are deaf or hard of hearing to the presence of people or sounds, providing non-violent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting individuals to the presence of allergens, retrieving items such as medicine or the telephone, providing physical support and assistance with balance and stability to individuals with mobility disabilities, and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors. The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition.

28 C.F.R. § 35. 104.

### 3. *Analysis*

The City's first challenge to Sak's contention that he is likely to succeed on the merits of his ADA claim is that he has not shown that the City discriminated on the basis of disability as to any program, service, or activity of the City. The City argues that the purpose of Title II of the ADA is to guarantee people with disabilities the same access to public services or employment as people without disabilities. The City argues that, in *Heather K. v. City of Mallard, Iowa*, 946 F. Supp. 1373, 1389-90 (N.D. Iowa 1996), I recognized that, to violate Title II of the ADA, a municipality's ordinance or regulation must have a discriminatory effect on a plaintiff's ability to take advantage of municipal

services, programs, or facilities, but that the evidence shows that Sak does not and does not intend to use Snickers to access any public services, or even any public places.

The City's reading of *Heather K* is selective. In that decision, I held, first, that, as a matter of law, Title II of the ADA will reach a city ordinance *"if* the City's ordinance has a discriminatory effect on the ability of persons with disabilities to take advantage of City services, programs, or facilities," but I also held that the regulation of any activity by a city, by an ordinance, is, itself, a program, service, activity, or benefit of the City that Title II of the ADA will reach. *Heather K*, 946 F. Supp. 1389-90. Other courts have also held that municipal zoning qualifies as a public "program" or "service," and that the enforcement of those rules is an "activity" of a local government, within the meaning of Title II of the ADA. *Wisconsin Community Servs., Inc.*, 465 F.3d at 750 (citing as examples *Bay Area Addiction Research v. City of Antioch*, 179 F.3d 725, 730-32 (9th Cir. 1999) (applying Title II to a city's zoning requirements); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 48-49 (2d Cir. 1997) (same)). If an ordinance regulating open burning, as was at issue in *Heather K*, or a zoning ordinance and zoning enforcement fall within the scope of the conduct of a public entity that can be regulated by Title II of the ADA, it follows that an ordinance that prohibits the presence of certain animals within city limits and enforcement of that ordinance, as are at issue here, would likewise fall within the scope of conduct of a public entity regulated by Title II of the ADA.[5]

---

[5]I am not persuaded that Sak's stated intention not to use Snickers outside of his home or yard means that a prohibition on his pit bull service dog cannot violate Title II of the ADA. A zoning ordinance that barred handicapped access ramps into or within a residence or a zoning ordinance requiring doorways in a residence too narrow for wheelchairs or enforcement of such ordinances would undoubtedly violate Title II of the

(continued...)

Furthermore, 42 U.S.C. § 12132 prohibits more than just discrimination on the basis of disability in the services, programs, or activities of a public entity. It also states that "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, this prohibition on discrimination by a public entity is not dependent upon conduct or regulations of a city that impinge upon a disabled individual's ability to enjoy the benefits of public services, programs, or activities.

At the very least, the DOJ's regulations for implementation of Title II of the ADA "warrant respect" as to their requirements that public entities must accommodate "service animals" necessary for disabled individuals. *See Wisconsin Community Servs., Inc.*, 465 F.3d at 751 n.10; *Frame*, 657 F.3d at 225; *Armstrong*, 622 F.3d at 1065. Where the evidence presented in support of the plaintiffs' Motion For Preliminary Injunction demonstrates that Snickers has been individually trained to do work and to perform tasks for Sak that are directly related to his disability, including assisting him with walking, balancing, retrieving items around the house, and assisting him when he falls out of his wheelchair, Sak has demonstrated a likelihood of success on the issue of whether or not Snickers is a "service animal" within the meaning of Title II of the ADA and 28 C.F.R. §§ 35.104 and 35.136. *See Sierra Club*, 645 F.3d at 993 (requiring "likelihood of success" to obtain a preliminary injunction, quoting *Winter*, 555 U.S. at 32). Where Sak has presented evidence that, notwithstanding a specific request to do so, the City has

---

[5](...continued)
ADA, because such ordinances and their enforcement would effectively bar disabled individuals from living in a city or zone of a city, even though the ordinances and their enforcement would directly regulate only those individuals' activities in their homes, not their activities outside of their homes or their access to public areas.

refused to modify its policies, practices, or procedures, as embodied in the Ordinance concerning pit bull dogs, to permit the use of a pit bull dog mix as a service animal by an individual with a disability, as required by 28 C.F.R. § 35.136(a), and there is no evidence that either of the exceptions to the City's obligation to do so in 28 C.F.R. § 35.136(b) apply in this case, Sak has shown, at the very least, a likelihood of success on his claim that the City is violating Title II of the ADA. *See Sierra Club*, 645 F.3d at 993.

Moreover, the restrictions in 28 C.F.R. § 35.136 on the extent to which a public entity can impose specific limitations on the way that service animals are handled or permitted access to areas of a public entity, *see* 28 C.F.R. § 35.136(c) and (g), demonstrate that the requirements even for "grandfathered," "licensed" pit bulls in the Ordinance would improperly impede effective use of Snickers as a service animal. *See* Ordinace, § 58.03(1)(D) (leashing and muzzling requirements), (E) (confinement requirements), (F) (confinement indoors requirements). Thus, Sak has sufficient likelihood of showing that these provisions of the Ordinance also violate Title II of the ADA to warrant preliminary injunctive relief.

The full extent to which Sak's proposed modifications of the Ordinance's prohibition on pit bull dogs or the requirements for "grandfathered," "licensed" pit bull dogs are reasonable may ultimately be a fact question. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1485-86 (9th Cir. 1996); *see also Heather K*, 946 F. Supp. at 1387-89 (also relying on *Crowder*, 81 F.3d at 1485-87, for the proposition that the reasonableness of modifications may be a fact question). Nevertheless, Sak has made sufficient showing that he is likely to succeed on a demand for some modifications to warrant preliminary injunctive relief.

It is no impediment to preliminary injunctive relief to argue that the Ordinance does not bar service animals at all, just use of full or mixed breed pit bull dogs as service

animals, as the City also argues.  The DOJ has addressed such a contention in its Guidance To Revisions To ADA Regulation On Nondiscrimination On The Basis Of Disability In State And Local Government Services (Guidance To Revisions), which provides a section-by-section analysis and response to public comments concerning the revisions to its regulations that included 28 C.F.R. § 35.136.  *See* 28 C.F.R. Pt. 35, App. A.  Among other things, the Guidance To Revisions addresses the argument that it should be permissible for a municipality to exclude certain breeds of dogs, even when used as service animals:

> Breed limitations.  A few commenters suggested that certain breeds of dogs should not be allowed to be used as service animals.  Some suggested that the Department should defer to local laws restricting the breeds of dogs that individuals who reside in a community may own.  Other commenters opposed breed restrictions, stating that the breed of a dog does not determine its propensity for aggression and that aggressive and non-aggressive dogs exist in all breeds.

> *The Department does not believe that it is either appropriate or consistent with the ADA to defer to local laws that prohibit certain breeds of dogs based on local concerns that these breeds may have a history of unprovoked aggression or attacks.  Such deference would have the effect of limiting the rights of persons with disabilities under the ADA who use certain service animals based on where they live rather than on whether the use of a particular animal poses a direct threat to the health and safety of others.*  Breed restrictions differ significantly from jurisdiction to jurisdiction.  Some jurisdictions have no breed restrictions.  Others have restrictions that, while well-meaning, have the unintended effect of screening out the very breeds of dogs that have successfully served as service animals for decades without a history of the type of unprovoked aggression or attacks that would pose a direct threat, e.g., German Shepherds.  Other

> jurisdictions prohibit animals over a certain weight, thereby restricting breeds without invoking an express breed ban.  In addition, deference to breed restrictions contained in local laws would have the unacceptable consequence of restricting travel by an individual with a disability who uses a breed that is acceptable and poses no safety hazards in the individual's home jurisdiction but is nonetheless banned by other jurisdictions.  *State and local government entities have the ability to determine, on a case-by-case basis, whether a particular service animal can be excluded based on that particular animal's actual behavior or history—not based on fears or generalizations about how an animal or breed might behave.  This ability to exclude an animal whose behavior or history evidences a direct threat is sufficient to protect health and safety.*

Guidance To Revisions (emphasis added).

While the Guidance To Revisions is not, itself, a "final rule," entitled to the full deference due a regulation itself, as Sak argued in his brief in support of his Motion For Preliminary Injunction, it is, nevertheless, an authoritative response to comments on the DOJ's proposed regulation requiring accommodation of service animals by public entities. Just as importantly, I find that the reasons offered by the DOJ in the Guidance To Revisions for rejection of breed-specific prohibitions on service animals under Title II of the ADA are persuasive.  *See e.g., Olmstead v. L.C.*, 527 U.S. 581, 597–98 (1999) ("The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."); *Auer v. Robbins*, 519 U.S. 452, 461 (1977) (holding that an agency's interpretation of its regulations is "controlling unless plainly erroneous or inconsistent with the regulation"). The record also shows that Sak has sufficient likelihood of showing that substitution of a non-pit bull service animal is not a reasonable accommodation, because Snickers has been

individually trained for his individual needs over as much as two years, and there would, consequently, be significant loss of time and difficulties involved in obtaining and adequately training an appropriate substitute animal, with the loss of security to Sak and potential for injury in the meantime. Thus, Sak is sufficiently likely to prevail on a claim that a breed-specific ordinance that incidentally bars him from having a pit bull dog as a service animal violates Title II of the ADA and that substitution of a non-pit bull service animal is not a reasonable accommodation for this factor to weigh in favor of injunctive relief.

I conclude that Sak has made sufficient showing of likelihood of success on an "accommodation" claim pursuant to 28 C.F.R. § 35.130(b)(7) for this factor to weigh heavily in support of preliminary injunctive relief, where he has marshaled evidence that his requested accommodations (*i.e.*, exceptions to the Ordinance) are necessary to avoid discrimination on the basis of Sak's disability, and the requested restrictions are reasonable. *Wisconsin Community Servs., Inc.*, 465 F.3d at 751.

### C. Irreparable Harm To Sak

"Likelihood of success" is "'meaningless in isolation . . . [and] must be examined in the context of the relative injuries to the parties and the public.'" *Roudachevski*, 648 F.3d at 706 (quoting *General Motors Corp. v. Harry Brown's L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009)); *accord Winter*, 555 U.S. at 23-24 (there is no need to reach the "likelihood of success" factor, if the balance of interests weighs against the injunction). Thus, even though I have found that Sak has sufficient likelihood of success on the merits of his Title II claim to weigh in favor of preliminary injunctive relief, I must still consider and balance the other *Dataphase/Winter* factors to decide whether or not to issue a preliminary injunction. Therefore, I begin that balancing process by examining Sak's

allegations of "irreparable harm." *See Winter*, 555 U.S. at 20; *Roudachevski*, 648 F.3d at 705 (citing *Dataphase*, 640 F.2d at 114).

The movant must show that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. In *Winter*, the Supreme Court clarified that, even where a plaintiff demonstrates a strong likelihood of prevailing on the merits, the plaintiff must do more than show a "possibility" of irreparable harm; rather, the proper standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis in the original) (rejecting as "too lenient" the "possibility" of irreparable harm standard used by the Ninth Circuit Court of Appeals and the district court in the case below). "'Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) (quoting *General Motors Corp. v. Harry Brown's, L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009)). The Eighth Circuit Court of Appeals has stated that, "[t]o succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Federal Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

Sak identifies the irreparable harm that he is suffering as a result of the exclusion of Snickers from the City of Aurelia, in the first instance, as degradation of his quality of life. Sak showed that he has already fallen from his wheelchair twice, without Snickers to aid his recovery, and that he was forced to call 911 for assistance on one of those occasions. He also showed that, without Snickers, he experiences greater fears, insecurity, and increased chances of injury from his disability, and is less able to operate in society. Sak argued that taking away his service dog inflicts injury on him comparable to taking

away his wheelchair, which is also a necessity. He also demonstrated that the loss of Snickers has had a negative impact on his relationship with Leifer, as he is now more dependent upon Leifer and less able to assist her, and Leifer is unable to leave him alone, for fear of another fall or injury. I also note that simply replacing Snickers with another service animal is not only not a reasonable accommodation, but that the loss of Snickers is likely to cause irreparable harm, because Snickers has been individually trained for Sak's individual needs. The loss of time and the difficulties involved in obtaining and training an appropriate substitute animal, with the loss of security to Sak and potential for injury in the meantime, also demonstrate that Sak's loss is irreparable. Thus, I find that Sak has demonstrated harm that is "irreparable," and that it is not just "possible," but "likely" in the absence of injunctive relief. *Winter*, 555 U.S. at 22. It is doubtful that the injuries to Sak could possibly be fully compensated through an award of damages. *Rogers Group, Inc.*, 629 F.3d at 789. Finally, such injuries are sufficiently imminent that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706.

This factor also weighs heavily in favor of preliminary injunctive relief.

### D.   Balance Of Equities

The next *Dataphase/Winter* factor is whether the balance of equities tips in favor of preliminary injunctive relief. *Winter*, 555 U.S. at 20; *Roudachevski*, 648 F.3d at 705-06 (stating the *Dataphase* factor as "the state of the balance between [the movant's irreparable] harm and the injury that granting the injunction will inflict on other parties" (citing *Dataphase*, 640 F.2d at 114)). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24 (quoting *Amoco Production Co.*, 480 U.S. at 542).

The competing injury that the City asserts appears to be that the lack of enforcement of its Ordinance as to Snickers undermines the public safety concerns that prompted the ban on pit bull dogs in the first place.  In the absence of any evidence that *this* trained and certified "service animal" has a history of aggression or causing injury to persons or property, however, that claim of injury rings hallow.  Because even preliminary injunctive relief to the full extent requested by Sak would not void the Ordinance or make it unenforceable as to any other pit bull dog, and the City would retain the ability to determine, on a case-by-case basis, whether this particular service animal can be excluded based on his actual behavior or history, not based on fears or generalizations about how a pit bull mix might behave, any purported injury to public health and safety is illusory. *See* Guidance To Revisions.  Moreover, the *balance* of the weak or illusory injury to public health and safety, if the Ordinance is suspended or modified as to Snickers, against the very real threat of irreparable injury to Sak, if Snickers continues to be excluded from the City and, consequently, cannot provide necessary services to Sak, is unequivocally in favor of preliminary injunctive relief.

### E.  The Public Interest

The last *Dataphase/Winter* factor requires me to consider whether an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Roudachevski*, 648 F.3d at 705-06.  I must consider both what public interests might be injured and what public interests might be served by granting or denying a preliminary injunction. *See Sierra Club*, 645 F.3d at 997-98.  The Eighth Circuit Court of Appeals has recognized that "the determination of where the public interest lies is also dependent on the determination of likelihood of success on the merits," because it is in the public interest to protect rights. *Phelps-Roger v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (First Amendment rights case).

There is some cogency to the argument that the Ordinance reflects a public interest in health and safety, but the regulations under Title II of the ADA reflect an apparently conflicting public interest in allowing disabled individuals access to and use of their service animals.   The Ninth Circuit Court of Appeals addressed a similar apparent conflict between a local public health law and Title II of the ADA in *Crowder v. Ktagawa*, 81 F.3d 1480 (1996), a case involving a claim that Hawaii's 120-day quarantine on carnivorous animals entering that state, which was designed to prevent importation of rabies, violated Title II of the ADA when applied to service animals for the visually impaired.   The court in *Crowder* found that "'the general intent of Congress' was 'to ensure that individuals with disabilities are not separated from their service animals,' such as guide dogs." *Crowder*, 81 F.3d at 1485 (citing 28 C.F.R. § 36, Appendix B, at 616 (service animals in public accommodations); 135 Cong. Rec. D956 (Statement of Sen. Simon) ("As an auxiliary aid, the use of assistive animals is protected by the Americans With Disabilities Act, in public accommodations as well as public services (including schools).").   The court then observed,

> We are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers.  *See Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 82-83, 66 S. Ct. 850, 851-52, 90 L. Ed. 1096 (1946).  However, when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved.

*Crowder*, 81 F.3d at 1485.   To put it another way, the national public interest in enforcement of the ADA "trumps" the more local public interest in public health and safety reflected in the Ordinance prohibiting pit bull dogs within the City of Aurelia.

34

### *F.  Summary*

I conclude that *all* of the relevant *Dataphase/Winter* factors weigh in favor of issuing a preliminary injunction against enforcement of the Ordinance against Snickers. *See Winter*, 555 U.S. at 23-24; *Sierra Club*, 645 F.3d at 992-93.  In these circumstances, it is appropriate to employ the extraordinary remedy of a preliminary injunction to bar enforcement of the Ordinance against Snickers.  *Winter*, 555 U.S. at 24; *Roudachevski*, 648 F.3d at 705-06.  Such a preliminary injunction, on appropriate terms, has issued.

## *III.  THE BOND REQUIREMENT*

Subsection (c) of Rule 65 of the Federal Rules of Civil Procedure requires the movant to give security for the issuance of a preliminary injunction.  *See* FED. R. CIV. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").  As I have explained, "The bond posted under Rule 65(c) 'is a security device, not a limit on the damages the [City] may obtain against [the plaintiffs] if the facts warrant such an award.'"  *Branstad v. Glickman*, 118 F. Supp. 2d 925, 944 (N.D. Iowa 2000) (quoting *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997)).  Furthermore, "[a]lthough [the Eighth Circuit Court of Appeals] allow[s] the district court much discretion in setting bond, [it] will reverse [the district court's] order if it abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations."  *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991) (citing *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)); *accord United Healthcare Ins. co. v. AdvancePCS*, 316 F.3d 737, 745 (8th Cir. 2002) ("We review the

amount of the bond for an abuse of discretion." (citing *Rathmann Group*, 889 F.2d at 789)).

In *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943 (N.D. Iowa 2006), I noted that courts were inconsistent on whether or not some security is always required before issuance of a preliminary injunction, but I reiterated my prior conclusion that, in light of the mandatory language of Rule 65(c), "'requiring a bond in some amount before issuing a preliminary injunction is far the better course.'" *Interbake Foods*, 461 F. Supp. 2d at 979 (quoting *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1279 (N.D. Iowa 1995)). However, in this case, as in *Interbake Foods*, I find that the amount of potential damages is extremely limited, because the City will not likely incur any costs or damages if the Ordinance is preliminarily enjoined only as to Snickers. *Id.* I also conclude that Sak's rights, improperly impinged by the Ordinance, are of such gravity that protection of those rights should not be contingent upon his ability to pay the bond. *Cf. Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004) (waiving the payment of any bond for this reason). Under the circumstances, I find that the appropriate amount of the bond required before issuance of the preliminary injunction is $1.00. *See Interbake Foods*, 461 F. Supp. 2d at 979 (also imposing a bond of only $1.00).

## IV. CONCLUSION

I noted at the beginning of this decision that "[w]hen a man's best friend is his dog, that dog has a problem." When a service dog is excluded by a city's breed-specific pit bull ban, that dog might have a problem but for Congress's passage of the ADA and the Attorney General's regulations and guidance on service dogs and breed limitations. The ADA was enacted "to provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities." 42 U.S.C.
§ 12101(b)(1). Included within this mandate was Congress's intention to ensure that
disabled individuals, like Sak, are not separated from their service animals. Thus, I find
that, whatever the legal bark of the City's Ordinance prohibiting pit bull dogs as a general
matter of public health and safety, it is sufficiently likely that enforcement of that
Ordinance against Snickers would take such an impermissible bite out of Title II of the
ADA and the regulations and guidance promulgated to implement it that a preliminary
injunction is warranted. There is also sufficient showing that enforcement of the
Ordinance against Snickers is causing and will cause irreparable harm to Sak. Granting
the injunction is not counterbalanced by any harm to the City. Finally, in my view, the
public interest in allowing Sak to keep and use his certified and registered service dog,
Snickers, substantially outweighs the City's interest in banning Snickers. This is one
small, but vital step for Sak, one giant leap for pit bull service dogs.

**IT IS SO ORDERED.**

**DATED** this 28th day of December, 2011.

_Mark W. Bennett_

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

JAMES SAK and PEGGY LEIFER,

      Plaintiffs,

vs.

THE CITY OF AURELIA, IOWA,

      Defendant.

No. C 11-4111-MWB

**PRELIMINARY INJUNCTION**

WHEREAS, this matter came before me pursuant to the December 22, 2011, Motion For Preliminary Injunction by plaintiffs James Sak and Peggy Leifer,

AND WHEREAS, I find that enforcement actions of the City of Aurelia, Iowa, or any of its subdivisions, administrative departments, agents, employees, or officials, pursuant to City of Aurelia Ordinance Chapter 58, Pit Bull Dog, against the service animal "SNICKERS," identified in the National Service Animal Registry database as ID C12694, and or plaintiff James Sak would impose irreparable harm or injury or the threat of such irreparable harm or injury upon James Sak, arising from a potential violation of James Sak's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and upon further consideration of all other relevant factors,

THE CITY OF AURELIA, IOWA, and any of its subdivisions, administrative departments, agents, employees, or officials, are hereby preliminarily enjoined from pursuing, instituting, continuing, or completing any and all enforcement actions pursuant to City of Aurelia Ordinance Chapter 58, Pit Bull Dog, against the service animal "SNICKERS," identified in the National Service Animal Registry database as ID C12694, and/or plaintiff James Sak until such time as this preliminary injunction is dissolved or

vacated, by this court or a reviewing court.   The preliminary injunction against enforcement of City of Aurelia Ordinance Chapter 58, Pit Bull Dog, against the service animal "SNICKERS," identified in the National Service Animal Registry database as ID C12694, and/or plaintiff James Sak, includes, but is not limited to, the following:

      1.      Enforcement as to "SNICKERS" and/or plaintiff James Sak of the prohibition on keeping, harboring, owning, or in any way possessing a Pit Bull Dog within the City of Aurelia, pursuant to Ordinance § 58.02;

      2.      Enforcement as to "SNICKERS" and/or plaintiff James Sak of any requirements for or restrictions on licensed Pit Bull Dogs, pursuant to Ordinance § 58.03; and/or

      3.      Interference in any way with the immediate return of "SNICKERS" to Mr. Sak or Mr. Sak's use of "SNICKERS" as a service dog, either in his home or anywhere within the limits of the City of Aurelia.

This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

Pursuant to the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure, this preliminary injunction shall issue upon the payment of security in the amount of $1.00.

**IT IS SO ORDERED.**

**DATED** this 28th day of December, 2011.

*Mark W. Bennett*
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

2